UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CITIZENS INSURANCE COMPANY OF AMERICA a Michigan Corporation, as Subrogee of Anderson University, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) | No. 1:11-cv-01263-SEB-TAB |
| vs. | ) ) | |
| JOHNS MANVILLE a Delaware Corporation, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| JOHNS MANVILLE, a Delaware Corporation, | ) ) ) | |
| Third-Party Plaintiff | ) ) | |
| vs. | ) ) | |
| RICHMOND GUTTERING COMPANY, | ) ) | |
| Third-Party Defendant. | ) | |

**ORDER ON PENDING MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on the Motion for Summary Judgment [Docket No. 50] filed by Plaintiff, Citizens Insurance Company of America ("Citizens") on July 18, 2012, and the Motion for Partial Summary Judgment [Docket No. 68], filed by Defendant and Third-Party Plaintiff, Johns Manville on October 24, 2012.  Citizens seeks to recover

1

from Johns Manville under both breach of warranty and negligence theories, via its subrogation rights, the amounts it paid under a property insurance policy for damages to the Flagship Enterprise Center located in Anderson, Indiana.  Johns Manville, in turn, has moved for partial summary judgment solely on Citizens's negligence claim arguing that it is barred by the economic loss doctrine and the terms of the Johns Manville Guarantee. Johns Manville also opposes Citizens's motion as to the breach of warranty claim contending that genuine issues of material fact remain as to the cause of the roof damage at issue, thus precluding summary judgment.  For the reasons detailed in this entry, we DENY Citizens's motion and GRANT Johns Manville's motion.  Trial will proceed on Citizens's breach of warranty claim.

## Factual Background

### The Flagship Enterprise Center

In 2009, the City of Anderson, Indiana, and Anderson University collaborated to build the Flagship Enterprise Center, a technology based business accelerator.  The 80,000 square foot building was created for use by fledgling entrepreneurs for light manufacturing and prototyping.  At all times relevant to this litigation, the Flagship Enterprise Center was insured under Anderson University's property policy issued by Citizens.

Mike Montgomery, an architect with the architecture firm krM Architecture ("krM"), performed as the architect of the Flagship Enterprise Center.  krM provided design services, prepared the schematic design and all of the construction documents, and

was also oversaw the construction administration of the project. The firm designed the Flagship Enterprise Center without a vapor barrier under the roof components and also designed the HVAC system without a dehumidification component.[1] krM specified that the roof for the Flagship Enterprise Center would be a fully adhered TPO roofing system with a water-based adhesive. krM approved Johns Manville as the supplier of the roof system, but concedes that it did not read the Johns Manville product literature before doing so.

Meyer Najem was hired as the general contractor on the Flagship Enterprise Center project. As general contractor, Meyer Najem hired subcontractors to construct and install various components of the building, including the roof. The Richmond Guttering Company ("Richmond Guttering") was hired to waterproof the building's flat roof. krM provided specifications for the installation of the roof, which it expected Meyer Najem and its subcontractors, including Richmond Guttering, to follow. However, although the krM roof specifications required a "Pre-Installation Roofing Conference," no such conference ever occurred.

**Roof Installation**

In August 2010, Richmond Guttering began its roofing work on the Flagship Enterprise Center, installing a Johns Manville thermoplastic polyolefin (TPO) roofing

---

[1] The design drawings for the HVAC system were not stamped by a professional engineer.

system[2] on the building.   Only Johns Manville "Approved Roofing Contractors" are approved to install Johns Manville's TPO roofs and Richmond Guttering was approved by Johns Manville to install TPO roofing systems.   One of the benefits of being an Approved Roofing Contractor is the access it provides to a wide range of Johns Manville products.   Additionally, only Approved Roofing Contractors may apply for a Johns Manville guarantee for the building owner.

By the time Richmond Guttering began to perform its roofing work, the precast concrete walls, the steel girders, and most of the steel roof decking were all already in place.   By August 17, 2010, Richmond Guttering began installing the first layer of the roof structure, which was the polyiso board, starting on the west end of the roof.   On August 31, 2010, the concrete contractor began pouring a section of the 80,000 square foot concrete slab floor.   On that same day, Richmond Guttering installed wood blocking, or nailer board, on the metal roof decking as well as up and over the sides of the parapet walls.   Neither the nailer board nor the fasteners used to attach the nailer boards to the parapet wall were Johns Manville products.   Roger Allen of Richmond Guttering testified that Richmond Guttering personnel improperly installed the nailer boards by failing to fasten some of the boards to the roof deck.

---

[2] According to the Johns Manville website, TPO roofing systems combine plastic and rubber to create a reliable, cost effective, and environmentally friendly commercial roofing system that is easy to install.  Johns Manville's TPO membranes "are reinforced with a polyester fabric and manufactured using an ultraviolet-resistant thermoplastic polyolefin formulation."  TPO Information Sheet.

By September 4, 2010, Richmond Guttering had completed installation of the field membrane and the parapet wall flashing, and was in the process of installing the coping over the top of the flashing.  None of the coping components were Johns Manville products.  After Richmond Guttering finished this portion of the roof installation, the remainder of the concrete slab floor was poured and permitted to cure.  The concrete contractor poured portions of the concrete slab floor on September 4, September 20, and September 29, 2010.  The entire floor was poured by September 30, 2010.  The installation of windows and doors in the Flagship Enterprise Center was completed by October 27, 2010, at which point the building was fully enclosed.  Concrete reaches design strength in approximately 28 days, but it continues to cure, meaning that water continues to evaporate from the concrete, for some time after that.  Thus, by the time the building was fully enclosed, the concrete had not yet reached design strength or finished curing.

On November 30, 2010 and December 1, 2010, Johns Manville's Senior Technical Service Representative Dean Kepler visited the site to inspect the Flagship Enterprise roof in order to ensure that the roofing system was being installed to Johns Manville's standards.  Generally, installation of a fully adhered Johns Manville TPO roofing system involves, first, the fastening of insulation to the roof deck, and second, the use of adhesive to attach a membrane to the insulation.  Johns Manville will not guarantee roofing systems that it has not inspected.  Johns Manville also requires that Approved Roofing Contractors provide the roof plans before any guarantee is issued.  Johns

Manville's records reflect that it received the roofing plans for the Flagship Enterprise Center.

**Johns Manville Peak Advantage Guarantee**

Following the inspections and Johns Manville's receipt of the roofing plans, Richmond Guttering paid Johns Manville $8,950 to issue to Anderson University a 20 year "Peak Advantage Guarantee" on the Flagship Enterprise Center's roofing system ("the Guarantee"). The Guarantee provided that Johns Manville promised to pay for the materials and labor required to repair the roofing system if any leaks occurred due to deficiencies either in the component materials or in the application of the roofing system. Specifically, the Guarantee provided in relevant part as follows:

> Johns Manville [hereinafter "JM"] guarantees to the original Building Owner that during the Term commencing with the Date of Completion, JM will pay for the materials and labor required to promptly repair the Roofing System to return it to a watertight condition if leaks occur due to: ordinary wear and tear; or deficiencies in any or all of the component materials of the Roofing System, or workmanship deficiencies in the application of the Roofing System.

Pl.'s Exh. 9.

The Guarantee contained certain exclusions, including:

> LIMITATIONS AND EXCLUSIONS
>
> …
>
> THE EXCLUSIVE RESPONSIBILITY AND LIABILITY OF JM UNDER THIS GUARANTEE IS TO MAKE REPAIRS NECESSARY TO MAINTAIN THE ROOFING

6

SYSTEM IN A WATERTIGHT CONDITION IN
ACCORDANCE WITH THE OBLIGATIONS OF JM
UNDER THIS GUARANTEE.

JM AND ITS AFFILIATES WILL NOT BE LIABLE FOR
ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES
TO THE BUILDING STRUCTURE (UPON WHICH THE
ROOFING SYSTEM IS AFFIXED) OR IT'S [sic]
CONTENTS, LOSS OF TIME OR PROFITS OR ANY
INCONVENIENCE.  JM AND ITS AFFILIATES SHALL
NOT BE LIABLE FOR ANY DAMAGES WHICH ARE
BASED UPON NEGLIGENCE, BREACH OF
WARRANTY, STRICT LIABILITY OR ANY OTHER
THEORY OF LIABILITY OTHER THAN THE
EXCLUSIVE LIABILITY SET FORTH IN THIS
GUARANTEE.

…

Because JM does not practice Engineering or Architecture,
neither the issuance of this Guarantee nor any review of the
Building's construction or inspection of roof plans (or the
Building's roof deck) by JM representative shall constitute
any warranty by JM of such plan, specifications, and
construction or in any way constitute an extension of the
terms and conditions of this Guarantee.  Any roof inspections
are solely for the benefit of JM.

*Id.*

Under the guarantee, Anderson University was obligated to notify Johns Manville

within 30 days of the discovery of any leak.  *Id.*

**Initial Problems with Water Damage**

Within two months of final installation and acceptance of the roof, water damage

began to occur.  On January 2011, Anderson University notified Meyer Najem of water

damage to ceiling tiles in the office section of the Flagship Enterprise Center.

Approximately one month later, in February 2011, the University notified Meyer Najem of additional water damage to ceiling tiles in the same area of the building. Personnel from Meyer Najem and Richmond Guttering inspected the roof at that time, but did not find any leaks in the roof. However, the inspection revealed the parapet wall pulling away from the roof decking, as well as moisture on the exterior walls of the building. In March 2011, Richmond Guttering and Meyer Najem personnel removed portions of the coping surrounding the roof because they believed that the water damage was being caused by winds blowing rain up under the coping of the parapet wall rather than from leaks through the roof. Johns Manville was neither involved in nor informed of the investigation of the January and February water damage and the disassembly of the coping.

Not until late March 2011, was Johns Manville first notified of the leaks and, upon inspection, identified a condensation issue that in its judgment was causing the water damage. Specifically, moisture was discovered between the roof membrane and the polyiso board. Mr. Kepler, Johns Manville's Senior Technical Representative, testified that he believed the lack of a vapor barrier in the building allowed moisture from inside the building to infiltrate the roof system. Mr. Montgomery, the architect for the Flagship Enterprise Center agreed that there was vapor condensation on the bottom of the TPO membrane and testified that it was possible that the moisture came from the curing of the concrete slab floor.

**Roof Failure During Wind Event**

8

On April 3, 2011, during a strong wind event, the TPO membrane on the Flagship Enterprise Center began to separate from the roof structure.  Richmond Guttering official Jeff Vargo testified that "[t]he membrane was under pressure, elevated and billowing along the parapet wall.  And at least 6,000 or 7,000 square feet was up in the air … it was almost as if it were inflated."  Vargo Dep. at 47.  Shortly thereafter, a large section of the TPO roof material completely "unadhered" from the structure and the TPO ended up hanging over the side of the Flagship Enterprise Center.  As an immediate response, the general contractor's employees and the staff at the Center placed tarps and plastic on the roof and inside the building in an attempt to limit the intrusion of water.

The next day, on April 4, 2011, Johns Manville was contacted about the incident.  On April 5, 2011, Mr. Kepler, who on two previous occasions had inspected the installation process, returned to survey the damage to the roofing system.  On April 7, 2011, Meyer Najem advised Richmond Guttering that the temporary fix of tarping and plastic sheeting was not keeping rainwater out of the building and that the Flagship Enterprise Center was continuing to be damaged.  Pursuant to Johns Manville's guarantee, Anderson University requested that a Johns Manville certified installer repair the roofing system.  In an April 8, 2011 email, Anderson University's insurer, Citizens, informed Richmond Guttering that it was eager to get the roofing system repaired to avoid interior damage to the building.  On that same day, staff at the Flagship Enterprise Center notified Meyer Najem and Richmond Guttering via email that rain was entering

the premises again through the roof and that more sheet plastic was being utilized inside the building in an effort to protect the internal office space.

As of April 12, 2011, Johns Manville had not begun to fix the roofing system, and, as a consequence, rainwater and other elements continued to damage the building. On that date, Anderson University notified Johns Manville by letter that its refusal to fix the roof, despite the guarantee, was increasing the damage to the building. When Johns Manville failed to respond by fixing the roof, in an effort to prevent further damage the University hired Fredericks Contractors to remove the failed TPO membrane and install a new, mechanically-fastened TPO membrane over the existing roofing system. Johns Manville subsequently informed the University that, because a different roofing system had been installed, the company's earlier guarantee was voided.

As Anderson University's insurer, Citizens paid the University more than $300,000 to repair the roofing system and to remediate the water damage. Citizens's payments following the loss also included the re-welding of the roof deck as well as the repair of the HVAC system, the interior drywall, and the nailers on the tops of the parapet wall on the roof.

**Expert Testimony Regarding the Cause of the Roof Failure**

Stephen Patterson, Director of Engineering Services for Roof Technical Services, Inc., performed an inspection of the Flagship Enterprise Center's roof after the April 3 wind event, observing a significant amount of condensation below the roof membrane in

the areas where the roof detached.  This moisture in his expert view affected the adhesion and wind uplift resistance of the roof membrane to the insulation.  According to Mr. Patterson, roofing industry design standards require a vapor retarder in situations such as this, which would prevent the vapor migration, condensation, and roof detachment.  No moisture was found in the areas where the roof still adhered.  Patterson Aff. and Exh. A at 5-6.

James Robert Stutzman, principal and managing partner of Architectural Forensic Consultants, also conducted an investigation and analysis of the roof failure at issue in this litigation.  According to Mr. Stutzman's report, the condensation resulted from moisture from the concrete curing which penetrated the roofing system and condensed under the TPO membrane, weakening the bond between the polyiso board and the membrane.  That moisture was subsequently exposed to low freezing winter temperatures, resulting in ice formation that produced frost-heave forces which caused the membrane to separate from the substrate.  Stutzman Aff. and Exh. A at 10-11.

According to Mr. Stutzman's report, the failure on the part of Meyer Najem to anticipate the effect of concrete curing on interior moisture levels and to provide adequate means of ventilation after concrete placement contributed to the condensation. Mr. Stutzman also opined that the failure of the architect to design and specify a vapor barrier on the underside of the polyiso insulation board allowed excessive internal moisture to condense on the underside of the TPO membrane, weakening the adhesive bond between it and the polyiso insulation board.  *Id.* at 10-15.

11

In addition to the condensation, Mr. Stutzman also observed that the coping and nailer boards had been improperly designed and installed by Richmond Guttering. These components were not part of the Johns Manville roofing system, and, according to Mr. Patterson's report, the improperly attached nailer boards and sheet metal coping and subsequent failure of these components was a critical factor in the April 3 wind failure. Patterson Aff. and Exh. A at 6-11. The failure of the coping along portions of the parapet wall resulted in the loss of securement of the edge of the roof membrane, which increased the effects from wind pressures and led to the peeling of the membrane. According to Mr. Stutzman, not only was the coping improperly installed, but the architect also failed to follow industry standard specifications and include compliance requirements for roofing system edge securement, which contributed to the failure of the coping. Stutzman Aff. and Exh. A. at 13-14, 16-17, 22-23.

**The Instant Litigation**

On September 16, 2011, Citizens filed its Complaint in this action seeking to recover via its subrogation rights under both negligence and breach of warranty theories the amounts it paid to Anderson University to replace the roof following the April 3rd wind event. On July 18, 2012, Citizens filed its motion for summary judgment on all claims, and, on October 24, 2012, Johns Manville filed a motion for partial summary judgment on Citizens's tort claim contending that the economic loss doctrine bars recovery under a negligence theory.

**<u>Legal Analysis</u>**

## I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## II.     Defendant and Third-Party Plaintiff's Motion for Partial Summary Judgment

We turn first to address Johns Manville's Motion for Partial Summary Judgment. In its Motion, Johns Manville argues that the economic loss doctrine bars Citizens from recovering under a negligence theory for damages allegedly sustained by the Flagship Enterprise Center, and thus, that Count I of the Complaint must be dismissed.

The economic loss rule provides that "a defendant is not liable under a tort theory for any purely economic loss caused by its negligence (including, in the case of a defective product or service, damage to the product or service itself) – but that a defendant is liable under a tort theory for a plaintiff's losses if a defective product or

services causes personal injury or damage to property other than the product or service itself." *Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010). Citizens does not dispute that the economic loss doctrine precludes tort recovery here for damage to the Johns Manville roof system itself. However, Citizens contends that it is entitled to recover for damages in tort to "other property" that were incurred, including for damage to the metal decking of the roof, the HVAC system, and the nailer boards attached to the top of the parapet walls.

The Indiana Supreme Court has previously addressed this issue on a few occasions, to wit, what constitutes "other property" under the economic loss doctrine. In *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150 (Ind. 2005), the plaintiff contracted for the purchase of a new home with a general contractor and separately entered into a contract with a stonemason to add a stone façade to the house. The stonemason allegedly improperly constructed and sealed the façade, allowing water to seep behind the stone, damaging not only the stone façade but also the interior walls and flooring of the home. The Indiana Supreme Court concluded that, under the economic loss rule, the plaintiff could not sue the stonemason in tort for the damage to the façade. However, the *Gunkel* Court reasoned that "[t]he economic loss rule does not bar recovery in tort for damage that a separately acquired defective product or service causes to other portions of a larger product into which the former has been incorporated." *Id.* at 156 (citation omitted). Because the homeowner had entered into an arrangement with the stonemason to install the stone façade that was separate and independent from the homeowner's contract with

the general contractor to build the home, the *Gunkel* Court held that the plaintiff could

recover in tort for the damaged interior as that constituted "other property" separate from

the "product" purchased from the stonemason.

The Indiana Supreme Court again addressed the "other property" aspect of the rule

in *Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C.*, 929

N.E.2d 722 (Ind. 2010) (hereinafter "*IMCPL*").  In *IMCPL*, the Public Library in the City

of Indianapolis brought suit against engineering subcontractors alleging that they

provided defective design and inspection services during construction of an underground

parking garage built as part of a renovation project of the entire library facility.  The

*IMCPL* Court held that the dispositive question was what "product" the plaintiff had

contracted to purchase, because, under the rationale set forth in *Gunkel*,

> [o]nly the supplier furnishing the defective property or
> service is in a position to bargain with the purchaser for
> allocation of the risk that the product or service will not
> perform as expected.  If a component is sold to the first user
> as part of the finished product, the consequences of its failure
> are fully within the rationale of the economic loss doctrine.  It
> therefore is not "other property."

*IMCPL*, 929 N.E.2d at 731 (quoting *Gunkel*, 822 N.E.2d at 155).

Distinguishing the facts from those in *Gunkel*, the court in *IMCPL* reasoned that,

unlike the separate transactions in which the homeowner in *Gunkel* had engaged, the

Library had "purchased a complete renovation and expansion of all the components of its

facility as part of a single, highly-integrated transaction," (*IMCPL*, 929 N.E.2d at 731),

and that the service purchased from the defendants "was an integral part of the entire

library construction project, not independent from it." *Id.* at 732. The *IMPCL* Court

concluded that the product the Library purchased was "the renovated and expanded

library facility itself," (*id.* at 731), and thus, that "[a]ny damages alleged to have resulted

from the [d]efendants' negligence were to the 'product' the Library purchased, not to

'other property.'" *Id.* at 732.

Similar to the large commercial construction project at issue in *IMCPL*, in the case

at bar Anderson University entered into a construction contract with Meyer Najem for the

construction of the entire Flagship Enterprise Center building, including the roof system,

the metal decking of the roof, the HVAC system, and the nailer boards attached to the top

of the parapet walls. In order to perform under that overarching contract, Meyer Najem

subcontracted the purchase and installation of the roofing system to Richmond Guttering

who purchased certain materials to assemble the roofing system from Johns Manville.

The facts here are thus distinguishable from *Gunkel* in that the University did not enter

into a separate transaction with Johns Manville for an entirely independent service or

product that was not integral to the overall construction project. Thus, based on the

reasoning set forth by the Indiana Supreme Court in *IMCPL*, we find that the "product"

purchased by Anderson University was the entire building itself, and therefore, any

damage to the building, including to its component parts, was to the product the

University purchased, not to "other property." Because the only damages alleged are

damages to the building, the economic loss doctrine clearly applies to bar Citizens's

claim for negligence.  Accordingly, we <u>GRANT</u> Johns Manville's Motion for Partial

Summary Judgment and Count I of the Complaint is dismissed.[3]

## III.   Plaintiff's Motion for Summary Judgment

Citizens contends that it is entitled to summary judgment on its breach of warranty

claim because it is undisputed that: (1) Johns Manville issued to Anderson University a

guarantee related to its roofing system that provided that Johns Manville would pay for

the materials and labor required to repair the roofing system if any leaks occurred

because of deficiencies in the component materials or deficiencies in installation; (2) the

roofing system failed; (2) Johns Manville received timely notice of the loss; (3) the

roofing system failure was directly related to its approved roofing contractor's defective

installation; and (4) Johns Manville refused to honor its guarantee.  Johns Manville

rejoins that there are genuine issues of material fact regarding whether it received timely

notice of the issues as required under the Guarantee and whether the damage to the roof

was caused by a deficiency that was covered under the Guarantee that preclude summary

judgment on Citizens's breach of warranty claim.  Before addressing the merits of these

arguments, we must resolve a choice of law issue that has arisen under these claims.

### A.  Choice of Law

In its brief in support of its motion for summary judgment on its breach of

warranty claim, Citizens cites exclusively Indiana law.  However, Johns Manville

---

[3] Given that the economic loss doctrine applies to bar Plaintiff's negligence claim, we need not address Defendant's alternative argument in support of dismissal.

contends that, based on the clear terms of the Guarantee, Colorado law applies.  It is undisputed that the Guarantee expressly provides: "All the terms and conditions of this Guarantee shall be construed under the internal law of the state of Colorado without regard to its conflicts of law principles."  Pl.'s Exh. 9.  Citizens did not file a reply brief, leaving Johns Manville's argument uncontroverted.  In light of Citizens's apparent acquiescence, coupled with the express language of the Guarantee, Colorado law will govern the issues arising under the breach of warranty.[4]

Under Colorado law, enforcement of a warranty or guarantee is grounded in contract principles.  *See Carpenter v. Donohoe*, 388 P.2d 399, 401 (Colo. 1964) ("An action for damages for breach of warranty, whether express or implied, involves the relations between the parties arising out of contract.").  A party attempting to recover on a claim for breach of contract must establish: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) breach by the defendant; and (4) resulting damages.  *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).

### B.  Timely Notice

Under the terms of the Guarantee at issue here, Anderson University was required to inform Johns Manville within 30 days of the discovery of a leak.  Pl.'s Exh. 9.  It is

---

[4] We note, in passing, that if Indiana law was applied to this dispute, the result would be the same as both Indiana's and Colorado's laws on warranty are based on the Uniform Commercial Code's Uniform Sales Act.  *Compare* COL. REV. STAT. ANN. § 4-2-101 and Official Comment *to* IND. CODE § 26-1-2-101 and Official Comment.

undisputed that Johns Manville received timely notice of the damage to the roof that occurred on April 3, 2011, following a wind event. However, Johns Manville was not notified within 30 days of prior water damage occurring in January and February 2011, incidents which Johns Manville contends were related to the cause of the subsequent failure of the roof on April 3, 2011. Again, because Citizens did not file a reply brief, this argument is uncontroverted. Thus, we hold that genuine issues of material fact exist regarding whether Anderson University provided timely notice to Johns Manville under the Guarantee.

### C. Cause of the Roof Damage

Genuine issues of material fact also remain regarding the cause of the roof damage and whether the cause of the damage was covered under the Guarantee. Citizens contends that Johns Manville personnel admitted in deposition testimony that the roofing system failure was directly related to the defective installation by its approved roofing contractor, which is a deficiency covered under the Guarantee. In support of this contention, Citizens cites the following deposition testimony of Johns Manville's Midwest Technical Lead Manager Mark Tenison:

> Q. And what does the guarantee provide as far as if there's a problem with the TPO system, what will Johns Manville do?
>
> …
>
> A. The guarantee provides that JM will send out a repair contractor within a timely manner to investigate all roof leaks. And then the guarantee covers, depending on the issue and

> what the language, you know, covers, it covers
> leaks due to material or installation issues.
>
> Q.     Okay.  And will the repair contractor make
>        necessary repairs at Johns Manville's expense if
>        necessary?
>
> A.     If it's covered under the terms of the guarantee,
>        yes.
>
> Q.     Was there anything about this installation that
>        wasn't covered under the terms of the
>        guarantee, in your opinion?
>
> A.     No.

Tenison Dep. at 24-25.

We do not read this deposition testimony to establish that the roof failure at issue

here was *due to* a deficiency in installation.  Rather, it appears that Mr. Tenison was

merely acknowledging that the Guarantee covers, in part, leaks due to deficiencies in

installation of the Johns Manville roofing system and that such a system had been

installed on the Flagship Enterprise Center.  There is no admission of causation or fault,

for that matter.

Citizens also contends that Johns Manville admitted in its answers to discovery

that the reason the roofing system on the Flagship Enterprise Center failed was because

its approved installer, Richmond Guttering, improperly installed it.  Specifically, Citizens

cites Johns Manville's answer to Interrogatory 19:

> 19.    State the complete factual and legal basis for the
>        allegation that abuse, neglect, modification, alteration,

negligent care, negligent maintenance and /or negligent installation of the subject roof caused or contributed to Plaintiff's damages.

**ANSWER:**

…

Richmond Guttering Company did not follow all of the manufacturer's installation instructions[.]

Pl.'s Exh. 22.  However, this excerpt cited by Citizens from Johns Manville's answer omits material portions.  The full, relevant portion of the answer provides as follows:

**ANSWER:**

…

Investigation and discovery, include expert discovery, are ongoing, and defendant continues to develop its defenses. Significant discovery of the installation contractors, Richmond Guttering, has not yet taken place.  As such, defendant reserves the right to supplement this Response as needed.  Furthermore, in accordance with Rule 33(d), see documents previously produced evidencing the improper installation and/or improper designed use of Johns Manville's roofing products.  In addition, see the Report and Findings/Roof Evaluation prepared by Rimkus Consulting Group, Inc., which states, in part, that Richmond Guttering Company did not follow all of the manufacturer's installation instructions as follows:

- the orientation of the insulation board;

- the placement of some fasteners through the decking troughs;

- the use of water-based adhesive on the vertical surfaces;

- the differing installation pattern of fasteners and reduced quantities of fasteners used to attach insulation boards to the decking both in the field and along the perimeter areas of the roof; and

- the reduced quantities of fasteners used to attach the wood nailers along the parapet walls.

*Id.*

The complete response plainly shows that Johns Manville identified three categories of "abuse, neglect, modification, alteration, negligent maintenance and/or negligent installation" that it believed caused or contributed to Citizens's damages, including design issues, installation errors by Richmond Guttering of the Johns Manville Roofing System, and installation errors of non-Johns Manville products (the nailer boards, for example). Certain of these identified deficiencies are covered under the Guarantee and others are not. This interrogatory did not seek an admission by Johns Manville as to which of these deficiencies was the ultimate cause of the roof damage at issue in this litigation, nor by its answer did Johns Manville make such an admission.

Johns Manville clearly disputes that the loss at issue here is covered by the terms of the Guarantee and has presented evidence sufficient to create a genuine issue of material fact as to the cause of the damage to the Flagship Enterprise Center's roof. Based on the testimony and opinions of Mr. Patterson and Mr. Stutzman, a reasonable jury could conclude from the evidence that the roof failure was the result of deficiencies not covered under the Guarantee, such as failures in the design of the building or failures of non-Johns Manville components of the roof, as opposed to being caused by the improper installation of one of Johns Manville's approved installers.

Citizens argues that under Indiana law in a breach of guarantee case, the plaintiff need not prove *why* the guaranteed product failed, only that it *did* fail.  Pl.'s Br. at 9 (citing *Nelson v. Marchand*, 691 N.E.2d 1264 (Ind. Ct. App. 1998); *Orto v. Jackson*, 413 N.E.2d 273 (Ind. Ct. App. 1980)).  Despite the fact that these cases are decided under Indiana rather than Colorado law, which makes them inapplicable as precedent, the cases cited by Citizens are in any event distinguishable from the case at bar.  At issue in both *Nelson* and *Orto* were comprehensive warranties providing that construction would be performed in a "good and workmanlike manner," (691 N.E.2d at 1269), or that the builder guaranteed "all materials and workmanship." 413 N.E.2d at 274.  In such cases, "[w]here a homebuilder guarantees the quality of workmanship and materials, a homeowner need not prove why a particular system failed, only that it did fail."  *Nelson*, 691 N.E.2d at 1270 (citations omitted).  But the types of comprehensive guarantees addressed in *Nelson* and *Orto*, to wit, where the guarantee covers the entire construction project, are not at issue here.

In contrast, Johns Manville did not guarantee construction of the entire Flagship Enterprise Center or even the entire roof structure.  It did not guarantee the design of the building, the design of the roof system, or the installation of non-Johns Manville roofing components.  Instead, the Johns Manville Guarantee is a limited guarantee providing that it "will pay for the materials and labor required to promptly repair the Roofing System to return it to a watertight condition if leaks occur *due to*: ordinary wear and tear, or deficiencies in any or all of the component materials of the Roofing System, or

workmanship deficiencies in the application of the Roofing System."  Pl.'s Exh. 9 (emphasis added).  Accordingly, the element of causation must be established before Johns Manville's liability for a breach of the Guarantee is determined.  Because genuine issues of material fact remain regarding whether the roof failure was due to one of the limited deficiencies covered by the Guarantee, Citizens's motion for summary judgment on its breach of warranty claim is <u>DENIED</u>.

## IV.    Conclusion

For the reasons detailed above, we <u>GRANT</u> Johns Manville's Motion for Partial Summary Judgment, and Count I of the Complaint accordingly is dismissed.  We <u>DENY</u> Citizens's Motion for Summary Judgment.  Trial on Citizens's breach of warranty claim against Johns Manville shall proceed in due course as will Johns Manville's claim against Third Party Defendant Richmond Guttering Company.

IT IS SO ORDERED.

Date:  _____04/09/2013_____               _Sarah Evans Barker_
                                                SARAH EVANS BARKER, JUDGE
                                                United States District Court
                                                Southern District of Indiana

Distribution:

Grantland M. Clapacs
BINGHAM GREENEBAUM DOLL LLP
gclapacs@bgdlegal.com

Catherine L. Coash
BLACK & MOSS P.C.
kitc@bdlaw.us

Michael J. Black
BLACK & MOSS, P.C.
mikeb@bdlaw.us

Daniel P. King
FROST BROWN TODD LLC
dking@fbtlaw.com

Matthew Reed King
FROST BROWN TODD LLC
mking@fbtlaw.com

Jon C. Abernathy
GOODIN ABERNATHY LLP
jabernathy@goodinabernathy.com

Mary F. Schmid
STEWART & IRWIN
mschmid@silegal.com